Filed 8/10/23  In re T.G. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re T.G., a Person Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>L.G.,<br><br>     Defendant and Appellant. | A166192, A166524<br><br>(Marin County Super. Ct. No. JV27156A) |

In these consolidated juvenile dependency appeals, L.G. (Father) challenges two orders.  First, he contends the juvenile court erred in its order at a six-month status review hearing (Welf. & Inst. Code, § 366.21, subd. (e)), by declining to place his son T.G. in his care, continuing to require drug testing as part of his case plan, and inadequately specifying the terms of visitation.[1]  Second, he contends the court erred in its order approving placement of T.G. in a short-term residential therapeutic placement

---

[1]     Except where otherwise indicated, all statutory references are to the Welfare and Institutions Code.

1

(§ 361.22) because a child and family team meeting was not convened to discuss the placement and other requirements were not met.

We will affirm the orders. Substantial evidence supports the juvenile court's finding that a return of T.G. to Father's care would create a substantial risk of detriment to T.G. The issues regarding drug testing and visitation have become moot due to subsequent orders, and we do not decide them. Father forfeited his challenges to T.G.'s placement by not objecting on those grounds in the juvenile court, and, in any event, the purported errors were harmless. Substantial evidence supports the court's approval of the short-term residential therapeutic placement (STRTP).

## I. FACTS AND PROCEDURAL HISTORY

For context, we first revisit the proceedings that were the subject of Father's prior appeal in this case; we then turn to the orders from which he presently appeals.

### A. Dependency Petition and Prior Rulings

T.G. was born in November 2010. At the time respondent Marin County Social Services Department (Department) became involved in 2021, T.G. lived with N.S. (Mother), and Father visited.

#### 1. Dependency Petition and Detention

After investigating multiple incidents involving T.G., the Department obtained a warrant removing him from Mother's care and placed him into protective custody. The Department filed a juvenile dependency petition (§ 300) in October 2021, alleging Mother was severely neglecting T.G., Mother's mental health issues impacted her care of T.G., and Father failed to protect T.G. because he "failed to seek legal custody or take other actions to ensure [T.G.]'s basic needs were met." The juvenile court detained T.G.

2

## 2. Jurisdiction/Disposition and First Addendum Reports

In December 2021, the Department submitted a report for the jurisdiction and disposition hearing. According to the report, Mother agreed that Father was T.G.'s father, although he did not appear on the birth certificate and was not present for T.G.'s birth. Father admitted his presence in T.G.'s life was sporadic. Knowing T.G. did not have a good living situation with Mother, he took T.G. out at times and taught him to do laundry and cook because Mother "doesn't do anything." Since being removed from Mother, T.G. visited with Father weekly at the Department office; Father was attentive and T.G. appeared attached to him.

The Department recommended reunification services for both parents. The social worker advised it would not be safe for T.G. to return to Mother's home given the severe neglect he endured, and it would not be safe to place T.G. with Father given Father's failure to protect T.G. from the neglect. Father's documented history of alcohol abuse and lack of consistency in T.G.'s life also weighed against placing T.G., with his high needs, in Father's care.

The court elevated Father to presumed father status and continued the matter.

In an addendum report dated December 14, 2021, the Department noted T.G.'s escalating behaviors in the resource parent's home and Father's evasiveness when the social worker asked Father where he worked, what he did for a job, and where he was living.

## 3. Jurisdiction and Initial STRTP

On January 4, 2022, both Mother and Father submitted on the issue of jurisdiction based on the Department's amended petition, which alleged Father's "negligent failure" to adequately protect T.G. from Mother. By this

3

time, T.G. had been placed at a STRTP, St. Vincent's School for Boys (St. Vincent's).[2]

### 4. Second Addendum Report

A second addendum report described Father's criminal history, which included five convictions for driving under the influence over a 20-year period, with the latest in May 2018. Father refused to discuss his criminal history with the social worker, claiming it meant nothing and he drank out of depression because Mother did not allow him to see T.G. He declined to submit to drug testing.

The Department recommended against placing T.G. with Father, noting T.G.'s profound neglect over the years and Father's failure to address it. Because Father was not forthcoming, the Department could not assess whether this failure was due to his alcohol use or untreated depression. Furthermore, while T.G.'s high needs meant Father had to be very open to working with the Department and receiving a wide range of services, Father was minimizing T.G.'s behaviors.

### 5. Disposition Hearing

The contested disposition hearing commenced on January 25, 2022. The social worker testified about the Department's decision not to place T.G. with Father, elaborating on the concerns set forth in the reports: Father knew of T.G.'s severe neglect but failed to act; he largely blamed Mother for what occurred and took no personal responsibility; he withheld information the Department needed to evaluate his circumstances; his criminal history

---

[2]    A STRTP is a residential facility, licensed by the California Department of Social Services (DSS), that provides short-term, specialized, and intensive non-medical treatment for children. (Health & Saf. Code, §1502, subd. (a)(18).)

included five driving under the influence convictions (DUI's); he did not allow the social worker to talk with individuals in his network to assess it for safety; he refused a referral for an additional parenting class because he thought he was a good parent and did not need help; he reported that he could not make appointments for T.G. and did little to enroll him in school; and questions about Father's housing caused concern. On cross-examination, the social worker acknowledged that Father's visits with T.G. were positive and that T.G. wanted to live with him. The hearing was continued to February 3, 2022.

### 6. Third and Fourth Addendum Reports

The Department's Third Addendum proposed an updated case plan, by which Father would develop a support network to assist him with caring for T.G., identify coping strategies to help him with the stress of parenting and conflict with Mother, and engage in drug/alcohol testing and a substance abuse assessment. The Department's Fourth Addendum advised that St. Vincent's had reported that T.G. became dysregulated after a virtual visit with Mother and a phone visit with Father.

### 7. Continued Disposition Hearing and Disposition Order

On February 3, 2022, the contested disposition hearing continued with further testimony from the social worker and L.G.

After considering the evidence and argument by counsel, the juvenile court denied Father's request for placement. The court noted Father's failure to act despite knowing T.G.'s circumstances, his lack of competence to provide for T.G.'s profound needs, his criminal history (which made it difficult for the court to believe he did not have a substance abuse problem), and his refusal to test. The court approved the case plan.

In February 2022, Father filed a notice of appeal (appeal number A164480), challenging the disposition order.

### 8. Initial STRTP Report and Hearing

Meanwhile, the Department submitted its report for court approval of its placement of T.G. in a STRTP, as required by section 361.22. The Department explained that T.G. was moved from his resource parent due to his aggressive behavior. The Department's Mental Health Practitioner (MHP) described T.G.'s inability to regulate his emotions independently, as well as his tantrums that resulted in physical aggression and property destruction, which placed T.G. and others at risk of harm. T.G. had also researched ways to kill himself. The MHP opined that T.G. required consistent structure in a therapeutic environment so he could learn appropriate boundaries, complete his activities of daily living independently, process his trauma, and implement positive coping skills. This could be accomplished in a STRTP.

An assessment by a "qualified individual" (QI assessment; see § 361.22, subd. (c), § 4096)) ruled out a community-based placement for T.G. due to his frequent symptoms of trauma, including emotional dysregulation, physical aggression, clinginess, sleep disturbance, oppositional defiance, low frustration tolerance, eating disturbance, inability to manage personal hygiene age-appropriately, and difficulty with peer relationships. According to the assessment, T.G.'s caregiver needed to understand developmental trauma and attachment disruption, and needed to have the time and skills to collaborate with T.G.'s school and mental health providers to ensure effective and prompt responses to T.G.'s needs. Although Father sought placement, the assessment recommended a STRTP for T.G. due to his need for "comprehensive, and trauma-specific support."

6

On February 8, 2022, the court held a hearing regarding T.G.'s STRTP at St. Vincent's. Acknowledging receipt of the Department's report and the QI assessment, the court approved the placement.

B. Current Matters

While Father's appeal from the disposition order was pending, the juvenile court held a six-month review hearing and another STRTP hearing, which are the subject of Father's current appeals.

1. Six-Month Review Report

The Department's six-month review report, filed in July 2022, recommended that T.G. remain a dependent of the court and that reunification services be continued as to both parents.

According to the report, Father visited T.G. weekly and requested more time with him. In-person visits were very affectionate; Father brought snacks and games and they discussed relatives and chess. Father also completed a three-course co-parenting class virtually, although he was unable to tell the social worker what he learned.

Father claimed to be living on a friend's boat. He declined to have a natural support system to assist him in meeting his case plan. He believed T.G. did not have special needs and he continued to resist services, claiming he could care for T.G. himself. He deflected when asked about his sobriety and did not sign releases to allow the Department to verify services. He did not want to participate in drug testing, treatment, therapy, or any more parenting classes. He did not believe T.G. had ADHD or PTSD (as diagnosed by a St. Vincent therapist) and denied that T.G. had behavioral or emotional challenges.

The Department reported that T.G. had improved significantly since being placed at St. Vincent's. The social worker characterized the change she

7

observed in T.G. since she was assigned to the case in November 2021 as "dramatic."

The Department had received notice that St. Vincent's would no longer be functioning as a STRTP for foster youth, and T.G. would have to be moved by October 11, 2022. T.G. maintained that he wanted to live with Father and return to public school.

The Department advised it would be detrimental to place T.G. with Father because Father was not equipped to handle T.G.'s emotional and physical behaviors or provide him with academic consistency. Father had not addressed the issues that previously prevented him from obtaining custody of T.G. For example, he continued to deflect blame to Mother and deny responsibility for what T.G. endured, and he rejected the recent test results from T.G.'s Individualized Education Program (IEP). In deciding that placement with Father would not protect T.G. from risk of further harm, the Department noted Father's DUI history, claims of being depressed and turning to alcohol, refusal to see a therapist, difficulty regulating his emotions, refusal to build a natural support network, inability to demonstrate any benefit from parenting classes, unclear housing and financial means, and unwillingness to recognize the challenges of T.G.'s behavior.

### 2. CASA Report

T.G.'s Court Appointed Special Advocate (CASA) filed a report on August 4, 2022. The CASA supported T.G.'s continued placement in a STRTP in light of T.G.'s challenging behaviors and progress in the program, despite two troubling incidents with other residents.[3] The CASA observed

---

[3] As described in the CASA's report, T.G.'s roommate once asked him to perform a sexual act. After T.G. reported it, the roommate was reassigned.

that Father was devoted to T.G., the two shared a bond, and Father believed that T.G.'s behavioral issues would resolve if he were simply placed in Father's care. Father rejected the idea that T.G. should have a neuro-psych assessment or might benefit from medication.

### 3. STRTP Notice re Greenacre Homes

On August 12, 2022, the Department sought the juvenile court's authorization of T.G.'s placement in a new STRTP, providing notice to all parties that T.G. had been placed at Greenacre Homes (Greenacre) in adjacent Sonoma County on August 10, 2022. The court set a hearing on the STRTP for September 13, 2022.

### 4. Department's Addendum Report for the Six-Month Review

An addendum report filed on August 26, 2022, by a newly-assigned Department social worker, updated placement options in light of St. Vincent's unavailability. T.G.'s team of providers, including his clinical team from St. Vincent's, concluded T.G. was not ready to "step down" to a lower level of care and should be transferred to another STRTP program. A QI Assessment completed on August 5, 2022, also concluded that T.G. was not ready to transition to a family-based setting and that a STRTP placement continued to be appropriate. The Department's report confirmed that T.G. was moved to Greenacre on August 10, 2022, and was transitioning well. Meanwhile, Father insisted he should have more access to T.G. and T.G. should be placed in his care.

---

On another occasion, a resident entered T.G.'s room and threatened to hurt him if he did not display his " 'private parts.' " A fight ensued when T.G. refused. According to the CASA, the incidents caused T.G. to feel less safe and "retraumatized [T.G.] to some degree." St. Vincent's and the Department agreed on a safety plan to help secure the residence.

Father, however, was not making progress on his case plan, which was geared toward helping Father become a safe and appropriate parent. The Department recommended a reduction in visitation frequency until he changed his behavior.

In addition, the social worker expressed concern that Father was undermining the supportive efforts of T.G.'s team by speaking negatively to T.G. about T.G.'s school, medication, and former resource parent, which led T.G. to adopt Father's opposition to things that could benefit him. When questioned about this, Father felt he had done nothing wrong. He blamed the prior social worker for his not having custody of T.G., and he spoke negatively about T.G.'s CASA and former resource parent. The Department therefore recommended reducing Father's visits to once a week and not allowing the unsupervised visits Father requested. The Department also recommended that phone calls remain supervised until there was no longer a concern that Father was having inappropriate conversations with T.G.

As for drug testing and assessment, the social worker explained that the case plan goals related to establishing Father's sobriety were designed to ensure that there were no safety concerns. Throughout the case, however, Father had been inconsistent in testing. Between July 11, 2022 and August 11, 2022, Father tested on a weekly basis, but before that he had not tested since April 23, 2022. The social worker acknowledged "an agreement made between the Department and [Father]" that Father would no longer have to test if he tested consistently for 30 days, but due to unanswered questions about Father's substance use, the new social worker asked Father to continue testing until he completed the court-ordered substance abuse assessment.

When Father did test, he consistently tested positive for marijuana. Father claimed the marijuana was prescribed, but the Department had not

received verification of any prescription. Furthermore, despite reporting being sober from alcohol since 2017, Father had tested positive for alcohol in February 2022.

Father was unwilling to participate in individual therapy or further parenting classes, because he thought they were unnecessary. As late as August 22, 2022, Father stated he would not engage in any additional case plan requirements because he felt he fulfilled his " 'contractual obligation' " with the Department. He did not believe he needed to make any behavioral changes before T.G. was placed in his care.

The Department recommended further family reunification services. In addition, the Department proposed an updated case plan, which would call for Father developing the caregiver skills identified in the QI assessments.

### 5. Six-Month Review Hearing and Order

At a contested hearing on September 1, 2022, the juvenile court accepted the Department's reports into evidence.

Father's counsel cross-examined Maria Rosas, the social worker for most of the review period. Rosas could not verify whether Father was consistently living on the boat she visited, because he stopped allowing her to visit. Although Father wanted to attend medical and other appointments for T.G., and Rosas had repeatedly tried to convince St. Vincent's staff to allow it, the staff refused because of their negative experiences with Father. Rosas acknowledged that Father did not appear under the influence "in the normal typical" way of slurred speech, falling asleep, or smelling of alcohol, but he became "so dysregulated" that it was difficult to discern if his behavior was related to his mental health, substance use, or his natural demeanor.

Rosas further testified that Father's visits with T.G. were consistent, affectionate, and increased during the review period because there were no

11

safety issues. Father was able to handle T.G.'s behavior during the visits. However, during a July 2022 visit at St. Vincent's pool, Father was yelling, criticizing the Department, and making other children uncomfortable. As a result, staff asked that Father not return for pool visits.

Rosas confirmed that between February and April 2022, Father had tested 16 times; he was positive for marijuana each time and on one occasion was positive for alcohol. Between April and July 2022, Father had not tested at all. She confirmed there was an agreement in July 2022 for Father to test consistently once a week for a month, which he did; the tests were negative for alcohol and positive for marijuana. She was told the marijuana levels would not necessarily be a "red flag."

Rosas testified that Father had to be reminded to attend Child and Family Team (CFT) meetings. During the meetings, Father did not respect or listen to the professionals discussing T.G.'s issues and never agreed with what they said. In other meetings, he disagreed with school psychologists and placement staff as well. It was difficult to discern if he understood what was being discussed, because he would interrupt, "scoff," or just not pay attention.

The new social worker, Andrew Peasley, testified that Father told him he learned patience, listening, and giving T.G. options in parenting classes and that his sister was willing to be a support.

After the testimony, the court heard argument from counsel. Through counsel, Father asked for T.G. to be placed in his care, and Mother supported his request. T.G.'s counsel did not want visitation reduced, but wanted the visits to be "therapeutic" rather than merely supervised. Counsel observed that Father "cannot seem to control his impulse to talk and talk about what's being said and talk negatively." Counsel added: "I'm seeing my client [T.G.]

12

watch that and learn from that. And he is going to have a difficult life if what he has learned is that, you know, you just say whatever you want even when it's negative about the professionals around you in a courtroom, you speak badly about people and speak when it's not your turn. I can't have him learning that."

The court found that placement of T.G. with either parent would create a substantial risk of detriment to his safety, protection, physical or emotional wellbeing. Neither parent had gained insight into the severity of T.G.'s problems. T.G. had made progress, but Father was undermining that progress by thinking he was an expert and not listening to what others had to say. The court told Father, "the fact that you've resisted and insist you don't have a substance abuse issue is a huge red flag for me about your ability to safely parent this child and a big red flag about the danger that he would be in if returned to you. So I'm also concerned that you just decided to stop testing" despite the court's order and instruction that a no-show would be considered a positive test. The court also commented on the lack of proof that Father's living situation was safe.

As to Father's visits, the court decided to "keep them supervised at this point, but I would like them very much to be therapeutic." From the bench, the court ordered "at least once a week therapeutic visits" and left "it to the discretion of the Department regarding adding an additional visit each week, with consultation with Minor's counsel."

The Findings and Orders After Hearing were filed on September 1, 2022. The order confirmed that return of T.G. to Father would create a substantial risk of detriment to T.G.'s safety, protection, physical or emotional wellbeing. In an attachment regarding visitation, the box for supervised visits was checked, and a box originally checked for two times per

13

week was interlineated by the court, who checked "other" with a handwritten statement: "Court orders therapeutic visits ideally twice a week to start, then can reduce as deemed appropriate by therapist and minor's counsel. . . ."

On September 9, 2022, Father filed a timely notice of appeal from the September 1, 2022 order (appeal number A166192).

### 6. Second STRTP Report and Father's Objection to the STRTP

The Department filed and served a report on September 8, 2022, for the hearing to consider T.G.'s STRTP at Greenacre. In its report, the Department advised that the transition continued to go well. During T.G.'s IEP meeting earlier that month, he was praised for learning new material quickly and engaging with teachers and peers. School staff felt he transitioned very smoothly into the new non-public school, which was the least restrictive environment.

The Department's report provided documentation regarding T.G.'s case plan (see § 361.22, subd. (c)(1)(B)). Under the heading, "Case Plan Documentation," the Department advised that its social worker would meet with STRTP placement staff monthly, exchange frequent phone calls and emails, and invite placement staff to CFT and other meetings with the Department to monitor T.G.'s placement and assess for safety and permanency. Father had expressed his opposition to the continued STRTP placement and made clear his feeling that T.G. would make more progress if he "returned" to Father's care.

The Department advised that an updated QI assessment for the new STRTP (see § 361.22, subd. (c)(1)(A)) confirmed the findings of T.G.'s clinical team and other providers that T.G. was not ready to be "stepped down" to a lower level of care. The updated QI assessment, completed on August 5, 2022, was attached to the Department's report.

14

The QI assessment provided background regarding T.G.'s removal from Mother and the "severe symptoms of PTSD" he displayed in the foster home, which led to his stay at St. Vincent's. St. Vincent's clinical staff reported a decrease in symptoms, but the symptoms continued to impair T.G.'s functioning. T.G. continued to demonstrate poor self-care and low frustration tolerance, defiance, and disruptive behavior in school. St. Vincent's program supervisor thought T.G. displayed ADHD symptoms that might be alleviated with medication, but T.G. refused to meet with a psychiatrist or take psychotropic medication.

The QI assessment further noted that T.G.'s therapist at St. Vincent's completed a comprehensive mental health assessment of T.G. in June 2022 and, as required by section 4096, subdivision (g)(3)(B), an "IP-CANS" (Integrated Practice – Child and Adolescent Needs and Strength Assessment) on May 24, 2022. A portion of the QI assessment titled "(IP) CANS" indicated that 12 categories of needs and risk behavior required action and interfered with T.G.'s functioning: anxiety, impulse control, anger control, affective dysregulation, hyperarousal, frustration management, opposition, avoidance, inability to pay attention, eating disturbance, living situation, and education.

In addition, the QI assessment set forth the skills required for a caregiver to meet T.G.'s needs, including "a strong understanding of early trauma and the implications of the trauma to be able to identify traumatic triggers and acting out, and how to appropriately respond to these enactments." The caregiver would need to be "emotionally stable and consistent with a strong ability to communicate their needs and emotions in a non-threating and nurturing way" and help T.G. access positive social supports and prosocial activities.

15

The QI assessment also identified T.G.'s short-term and long-term goals, explained why T.G.'s needs could not be met by family or in a family-based setting, and stated why a STRTP would provide the most effective and appropriate level of care consistent with T.G.'s short- and long-term goals. The QI agreed that T.G. was not ready to step down and needed comprehensive services to support his growth and maturity.

The QI assessment concluded: "Because [T.G.]'s symptoms and developmental trauma require so much attention, his caregiver will need extensive knowledge and understanding of developmental trauma, of attachment disruptions and loss, and will have strong emotional intelligence and self-awareness around their own needs and triggers. . . . [T.G.]'s parents are yet to demonstrate that they can provide a safe, nurturing, and appropriate home for him and that they can consistently and appropriately attend to and address his basic medical health, mental health, and educational needs."

Father filed a JV-236 form on September 9, 2022, informing the court of his opposition to the STRTP. Because T.G. was "sexually molested" twice at St. Vincent's, Father believed he could keep T.G. safer with him, and he could parent T.G. and provide everything he needed.

### 7. STRTP Hearing and Order

At a hearing on September 13, 2022, the juvenile court noted it had read the Department's STRTP report and Father's objection to the placement. No witnesses were called. Father did not object to the Department's STRTP report or the QI assessment.

Father's counsel argued that placement at the STRTP added barriers to reunification, because of issues with visitation and with staff not allowing Father to accompany T.G. to medical appointments.

16

T.G.'s counsel stated that T.G. objected to the placement because he was unhappy at Greenacre and wanted to return to Father. Counsel observed that T.G. was very young to be at a STRTP and the Department should search for an intensive foster care home to get him "stepped down" as soon as possible.

County counsel emphasized, however, that the issue before the court was the level of care T.G. needed, and the QI assessment supported the STRTP. In addition, county counsel advised that the previously-ordered therapeutic visits were no longer an option due to the unavailability of a therapist.

The court found that T.G.'s needs could not be met through a family-based setting and that a STRTP was the best alternative. It therefore approved T.G.'s placement at Greenacre. The court modified visitation to "regular supervised."

Father filed a timely notice of appeal from the order approving the STRTP (appeal number A166524). We consolidated appeal number A166192 (challenging the six-month review order) and appeal number A166524.

C. Issuance of Opinion in Appeal A164680

In January 2023, we issued our opinion in Father's prior appeal (A164680), affirming the juvenile court's disposition order, including the finding that it would be detrimental to place T.G. in Father's care.

II. DISCUSSION

We address Father's contentions in turn.

A. Six-Month Review Order

As to the orders arising out of the six-month review, Father challenges the denial of placement, the continuing requirement that he drug test, and the visitation order. We reject these challenges.

17

## 1. Denying Placement With Father

At a six-month review hearing, the juvenile court must order a child returned to parental custody "unless the court finds, by a preponderance of the evidence, that the return of the child to their parent . . . would create a *substantial risk of detriment* to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1), italics added.) The social worker has the burden of establishing detriment. (*Ibid.*)

In deciding the detriment issue, the juvenile court must "consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which he or she availed themselves of services provided." (§ 366.21, subd. (e)(1).) A parent's failure to "participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.21, subd. (e)(1).) Moreover, even if the parent has complied with the reunification plan, the court must also consider whether the parent made progress in eliminating the conditions that led to the child's removal. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400); *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1140–1142.) We review a detriment finding for substantial evidence. (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424.)

Here, substantial evidence supported the juvenile court's conclusion that returning T.G. to Father would create a substantial risk of detriment to T.G.'s safety, protection, or physical or emotional well-being.

In the first place, Father did not comply with aspects of his case plan. As ordered at disposition in February 2022, the case plan required, among other things, that Father submit to random drug testing and undergo a substance abuse assessment. Father did not consistently submit to drug testing, missing tests from April 23, 2022, to July 11, 2022. Nor did he

18

complete a substance abuse assessment. His failure to participate regularly and make substantive progress in court-ordered treatment programs constitutes prima facie evidence that placing T.G. with him would be detrimental. (§ 366.21, subd. (e)(1).)

Furthermore, Father did not make progress in eliminating the issues that led to the detriment finding at disposition, which had prevented T.G.'s placement with Father in February 2022. At that time, the court's concerns included, among other things, Father's lack of competence to care for T.G.'s needs, his refusal to drug test, and his criminal history including several DUIs. At the time of the September 2022 six-month review order, Father still had not shown an ability to handle T.G.'s needs or addressed concerns about his substance use.

For example, Father had not cared for T.G.'s needs beyond attending visits. Although he took a parenting class, he refused to take a more robust class recommended, albeit not required, by the social worker. More telling, he was initially unable to tell the social worker anything he learned from the class he took. He minimized T.G.'s documented needs and challenges. He rejected professional diagnoses. He refused to build a support network or invite friends or family to CFT meetings, insisting he could raise T.G. on his own. He displayed dysregulated behavior, and the social worker could not discern whether it was due to substance use, unresolved mental health issues, or his usual disposition. He refused individual therapy. He continued to deny responsibility for T.G.'s situation and instead blamed Mother, the Department, and the prior social worker. He continued to be evasive and uncooperative with the Department, declining to provide basic information such as his means of support and details about his living arrangement. He alienated staff at St. Vincent's to the point they would not let him attend

19

appointments or visit T.G. at the pool. Although Father submitted to four drug tests from July 11 to August 11, 2022, he missed many weeks of tests before that and never completed the required substance abuse assessment; when Father did test, he consistently tested positive for marijuana and never showed the social worker the marijuana prescription he claimed to have. Substantial evidence therefore supported a finding that, while there was a bond between Father and T.G. and supervised visits went well, placing T.G. with Father would create a substantial risk of detriment to T.G.

Father asserts several arguments in his opening brief, all of which are unavailing, as discussed next.

### a. Drug Testing and Substance Abuse

Father contends the juvenile court's concerns about his drug and alcohol use were insufficient for a detriment finding. For this proposition, he relies heavily on *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322 (*Jennifer A.*), which concluded that a juvenile court incorrectly found detriment based *solely* on a mother's missed and diluted tests, where her children had not been removed due to allegations of substance abuse. *Jennifer A.* is inapposite.

In *Jennifer A.*, the mother's two children were taken from her care because she left them in a motel room when she went to work one day, expecting the children's father to watch them. (*Jennifer A., supra.*, 117 Cal.App.4th at pp. 1326, 1329.) As early as the six-month review, the social worker and the mother's therapist recognized she accepted responsibility for the circumstances that brought the children into juvenile court custody and had learned proper parenting skills. (*Id.* at p. 1326.) She engaged consistently in 18 months of services, including a parenting course and

20

individual counseling.  (*Id*. at pp. 1341–1342.)  Her skills improved and she did what was normally associated with good parenting.  (*Id*. at pp. 1345–1346.)  She had always maintained a parental relationship with her children, she was gainfully employed, there were no concerns over her living conditions, there was no evidence of mental illness or impairment affecting her parenting, and she had cooperated with the social worker.  (*Id*. at p. 1345.)  Mother had missed nine out of *95* tests, tested for marijuana once, and gave diluted specimens five times, but under the totality of those circumstances—which were vastly different than Father's circumstances here—the mother had substantially complied with the terms of her reunification plan.  (*Id*. at p. 1343.)  *Jennifer A*. bears no resemblance to this case.[4]

Father next points out that he complied with the agreement he forged with the social worker to test weekly for four weeks (July 11—August 11, 2022) without any spikes in marijuana levels.  While it is true that the social

_____

[4]    Other cases on which Father relies are also distinguishable.  In *In re G.S.R.* (2008) 159 Cal.App.4th 1202, the juvenile court had terminated the parental rights of a nonoffending, noncustodial father who did not attend Alcoholics Anonymous meetings as promised.  (*Id*. at p. 1209.)  The appellate court reversed, noting there was no finding of parental unfitness, there was no showing that missing the meetings posed any risk, and the father's issues with domestic violence and substance abuse had been resolved before the filing of the dependency petition.  (*Id*. at pp. 1211–1215.)  Not so here.  As to *In re C.M.* (2014) 232 Cal.App.4th 1394, we explained in Father's prior appeal:  "the evidence of a father's drug problem in [*In re C.M.*] was an unsubstantiated allegation made by a mother whose 'mental health issues made her a questionable reporter on the issue.'  Here, such evidence appears in DUI convictions as recent as 2018—well after [father]'s 2010 participation in a Salvation Army drug treatment program—along with [father]'s resistance to drug testing."  (*In re T.G.* (Jan. 11, 2023, A164680)__Cal.App.5th__[2023 Cal.App. WL 154555].)

worker agreed to "mark testing as completed" if Father fulfilled this arrangement, Father's submission to these four tests did not change the fact that he missed all the tests between April 23 and July 11 and that he still had not completed a substance abuse assessment in violation of his case plan and court order. When a new social worker informed Father he needed to continue testing until he completed the assessment, Father refused.

Father also argues that social worker Rosas could not name any colleagues or visitation staff who saw him under the influence, and she did not observe classic signs of intoxication such as slurred speech, falling asleep, or smelling of alcohol; to the contrary, Father appeared sober. However, the social worker also testified that Father's behavior was dysregulated and she could not tell whether he was under the influence, had unresolved mental issues, or was displaying his usual behavior. That supports, rather than refutes, a finding of substantial risk of detriment.

Lastly, Father insists that the low levels of marijuana in his system did not prove he would endanger T.G. However, he never showed the marijuana prescription he claimed to have. That failure, together with his missed tests, his refusal to undergo a substance assessment, his denial of T.G.'s documented needs, and his refusal of help and professional insights, provided substantial evidence to support the court's decision. It is not our role to reweigh the evidence.

### b. Parenting Classes

Father attacks the juvenile court's observation that completing six sessions of a parenting class was inadequate. He insists that he complied with the case plan and, while the social worker wanted him to take an additional course, the case plan did not require him to do so. The court's point, however, was not that Father failed to comply with the case plan, but

that the few sessions he took were not themselves sufficient to conclude he was suddenly equipped to care for T.G. full-time.  This observation was reasonable.

### c.  Lack of Insight

Father next challenges the juvenile court's view that Father lacked insight into T.G.'s challenges.  In particular, he urges, there was no psychological or expert evidence that Father was unable to comprehend the issues T.G. might face.

Here, however, expert witness testimony was unnecessary to conclude Father lacked insight into T.G.'s issues, particularly since Father stated that T.G.'s documented issues did not exist.  This was not a situation where the court or a social worker made some vague reference to a lack of insight without substantiation in the record or a link to potential detriment.  To the contrary, the Department's reports overflowed with concrete facts from which Father's lack of insight could readily be inferred.  (See *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 ["denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision"]; *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["[o]ne cannot correct a problem one fails to acknowledge"].)

Father's reliance on *In re Heather P.* (1988) 203 Cal.App.3d 1214, *In re Jasmon O.* (1994) 8 Cal.4th 398, and *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, is misplaced.  None of those cases held that a parent's repeated denial of a child's needs cannot be considered by the juvenile court in assessing whether placement with that parent would create a risk of detriment.  Nor did they hold that expert witness opinion is indispensable to that assessment:  while *Jasmon O.* observed that expert witness testimony can be helpful and should not be excluded or denied substantial weight if

presented, it did not hold that expert witness testimony is required to show a parent's lack of insight or detriment. (*Jasmon O., supra,* 8 Cal.4th at p. 430.)

### d. Benefits of Placement with Family

Father argues that "the record does not disclose the [juvenile] court gave consideration or preference to the long-term benefits of living with family, as opposed to placement in a group home." The argument is unavailing for multiple reasons.

First, the question at the six-month review is whether placement with Father would create a substantial risk of detriment to T.G.; substantial evidence supported that conclusion. Second, to the extent the benefit of living with family was a required consideration, it is presumed the court followed the law and there is no contrary indication in the record. Third, even if the court had to consider the benefit of living with family and failed to do so, Father has not shown that it made any difference: less than two weeks after the six-month review hearing, the court concluded at the STRTP hearing that T.G.'s needs could not be met through a family-based setting.

The juvenile court did not err in concluding that placement with Father would create a substantial risk of detriment to T.G.

### 2. Continued Drug Testing

Father contends the court erred at the six-month review by continuing to require drug testing as part of his case plan. He argues that he completed over 20 drug tests, he complied with the agreement concerning testing in July-August 2022, he was not observed to be under the influence, and the low level of marijuana in his system was due to pain management. He urges that the drug testing component be reversed.

Father's challenge to the drug testing aspect of his case plan is moot. On February 7, 2023, the juvenile court terminated reunification services as

24

to Father, and there is no longer any requirement that Father submit to testing.[5]  Because there is no further relief we could grant, we need not address the merits.  (*Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541.)

We have discretion to review moot issues "if they present important questions affecting the public interest that are capable of repetition yet evade review." (*In re J.P.* (2017) 14 Cal.App.5th 616, 623).  We are not persuaded to exercise this discretion here.  (See *In re Andres G.* (1998) 64 Cal.App.4th 476, 483 ["the appropriateness of any given order is so case specific that little use would be served by our review of the matter in any given case"].)

### 3. Visitation

Father contends the visitation order arising from the six-month review failed to specify the duration of the visits and was ambiguous as to their frequency.  Father asks that we reverse the visitation order and remand for the juvenile court to correct these shortcomings.

The sufficiency of the visitation order is moot.  In connection with the 12-month permanency hearing in February 2023, the juvenile court issued a new visitation order.  Even if the court erred in its ruling on visitation at the six-month review, the only relief Father requests is a new order, which the juvenile court has already issued.

---

[5]     Respondent requested judicial notice of the juvenile court's February 7, 2023 order pertaining to the 12-month permanency hearing, at which the court terminated reunification services for Father, found that placing T.G. with him would (still) create a substantial risk of detriment, and issued a new visitation order.  We deferred our ruling on the unopposed request until our consideration of the merits.  We now grant it.

25

B.  Order Approving the STRTP

Father contends the September 13, 2022 order approving T.G.'s placement in the STRTP at Greenacre must be reversed, because the procedure for such an approval was not fully followed.  We disagree.

1.  Statutory Framework

Effective October 1, 2021, section 361.22 sets forth procedures by which the juvenile court must review placements of juvenile dependents in a STRTP, as well as procedures the placing agency must follow when seeking court approval.  As relevant here, section 361.22 requires the following.

No later than five calendar days after placing the juvenile dependent in a STRTP, the social worker must ask the court to set a hearing to review the placement, serving the request on all parties.  (§ 361.22, subd. (b)(1), (2).)  Within five calendar days of the social worker's request, the juvenile court must set and notice the hearing to occur within 45 days after the placement began.  (§ 361.22, subds. (a)(1), (d).)

Pursuant to section 361.22, subdivision (c), the social worker must submit a report that includes, among other things, (1) a *QI assessment* as to the appropriateness of the STRTP in light of the needs of the child (§ 4096, subd. (g)), and (2) *case plan documentation* required pursuant to section 16501.1, subdivision (d)(2)(C).  The social worker must serve all parties with the report not more than seven calendar days before the hearing.  (§ 361.22, subd. (c)(2).)

The QI assessment required by section 361.22, subdivision (c), is an evaluation by a "qualified individual" (e.g., a licensed mental health professional) as to whether the child's needs make a STRTP appropriate, as compared to placement in a less restrictive setting.  (§ 4096, subd. (g).)  Among other things, the QI assessment must include "[e]ngagement with the

26

*child and family team members*" (§ 4096, subd. (g)(3)(A)) and evaluate the child's strengths and needs and short- and long-term behavioral and mental health goals (§ 4096, subd. (g)(3)(B), (C)). (Italics added.)[6] Similarly, the QI must document its "engagement with the child and family team members" (§ 4096, subd. (g)(4)(C)) and determine whether the child's needs can be met with family members or in a family-based setting (§ 4096, subd. (g)(4)(A)), and, if not, set forth why a STRTP will provide the child with the most effective and appropriate level of care in the least restrictive environment and how the STRTP is consistent with the child's short- and long-term goals (§ 4096, subd. (g)(4)(B)), italics added).

The case plan documentation required by section 361.22, subdivision (c), is described in section 16501.1, subdivision (d)(2)(C). It too refers to participation by child and family team members. Specifically, it requires the Department to document in the case plan the social worker's reasonable and good faith effort to include all required individuals in the "child and family team" and, as relevant here, the case plan must document "[e]vidence that the determination required under subdivision (g) of Section 4096 was conducted in conjunction with the child and family team."

At the hearing to review the STRTP, the juvenile court must consider the QI assessment and the other information provided by the Department under section 361.22, subdivision (c). The court determines whether the

---

[6]    A "child and family team" (CFT) is defined in section 16501, subdivision (a)(4). CFT members may include the child, the child's family, and others important to the family or the child in developing a case plan and placement, such as caregivers, social workers, mental health professionals, and the child's CASA. (§ 16501, subd. (a)(4)(B).) The "activities of the [child and family] team" shall include providing input into the child and family plan, the placement decision, and determinations by a QI pursuant to section 4096. (§ 16501, subd. (a)(4)(A); see also § 16501, subd. (a)(5) [CFT meetings].)

child's needs can be met through placement in a family-based setting or, if not, whether placement in a STRTP provides the most effective and appropriate care setting for the child in the least restrictive environment. The court also determines whether a STRTP level of care is consistent with the child's short- and long-term mental health and behavioral health goals and permanency plan, approves or disapproves the placement, and makes a finding, in writing or on the record, of the basis for its determination. (§ 361.22, subd. (e)(1)–(3), (5).)

Rule 5.618(g) of the California Rules of Court sets forth additional requirements, including that the juvenile court must determine whether the placement in the STRTP is consistent with the child's best interest.

### 2. Father's Arguments

Father contends the Department and juvenile court failed to comply with the requirements for approving the STRTP, in two respects.

First, he points out that no CFT meeting was convened specifically for the STRTP at Greenacre. Noting the reference in section 361.22, subdivision (c) to the QI assessment and case plan documentation, and the statutory requirements for the QI assessment and case plan documentation that refer to engagement with the CFT, Father asserts: "The record does not indicate that the Department or court referred the matter for the [CFT assessment] under section 16501 and 16501.1 prior to approval of the out-of-county STRTP placement at Greenacre," and it does not indicate the QI assessment under section 4096 "received the CFT referral investigation." Father argues that the approval order must be reversed, citing *In re A.M.* (2020) 53 Cal.App.5th 824.[7]

---

[7] In *In re A.M.*, the juvenile court erred by approving a STRTP for a minor at disposition in a juvenile delinquency proceeding, without any CFT

28

Second, Father argues that other requirements for the QI assessment were unmet, pointing to provisions in section 4096, subdivision (g), section 11462.01, subdivision (b), and DSS All-County Letter No. 21-114 (Sept. 30, 2021). Father's arguments lack merit for several reasons.

### 3. Forfeiture

Father did not raise in the juvenile court any of the violations he now raises in this appeal. His arguments are therefore forfeited. (*In re Dakota S.* (2000) 85 Cal.App.4th 494, 502 [waiver due to appellant "failing to object in the juvenile court to the lack of a preliminary assessment of the prospective guardian"]; *In re Crystal J.* (1993) 12 Cal.App.4th 407, 411–412 [waiver due to failure to object to the adequacy of an adoption assessment].)

Citing *Guardianship of Christian G.* (2011) 195 Cal.App.4th 581, 596, Father contends there was no waiver, urging that he should not have to remind the Department or the court of their mandatory duties and statutory prerequisites for approval of a STRTP. In that case, however, the court of appeal found that the appellant had objected sufficiently to the lower court's failure to refer a case to Child Protective Services (CPS) for investigation. (*Id.* at p. 595.) In addition, because the duty to refer the matter to CPS was imposed directly on the government and should not require prompting, and because the ramifications of lacking a CPS referral raised a largely legal

---

being convened, despite repeated requests for a CFT by the minor's attorney. (*In re A.M.*, *supra*, 53 Cal.App.5th at pp. 828–833, 839.) Here, multiple CFT meetings were convened regarding T.G., neither T.G.'s counsel nor anyone else requested another CFT meeting concerning T.G.'s placement at Greenacre, and no one objected at the STRTP hearing to the Department's report, the QI assessment, or the absence of a STRTP-related CFT. We do not decide how *In re A.M.* might apply to the circumstances of this case, since we resolve the issues Father raises on other grounds.

question, the court stated it would exercise its discretion to address the merits of the appeal.  (*Id*. at p. 596.)

Here, there are no compelling reasons for us to exercise discretion and decide the merits of issues Father declined to raise in the juvenile court.  This is not a situation where the social worker failed altogether to provide a report or assessment statutorily required for the court to make its determination.  Instead, the Department provided the court with its report, the case plan documentation, and the QI assessment, albeit without convening a CFT.  While a placing agency may have a mandatory duty to convene the CFT, Father still had an obligation to raise the matter so that shortcomings could be remedied before the court made its ruling.  And while Father argues that the Department did not serve its report in a timely manner, even without the report Father would have known he was not involved in a CFT concerning the Greenacre placement.  There is no indication that receiving the report a couple of days late precluded Father from asserting the issues he now raises.

Accordingly, Father has forfeited his challenge to the STRTP order, to the extent he seeks reversal due to the failure to meet the requirements for approval.  (To the extent Father contends the absence of a CFT resulted in a lack of substantial evidence supporting the court's order, we address his contention *post*.)

### 4. Harmless Error

Even if Father had not waived his challenge, and even if Father established that the Department and juvenile court did not comply with the statutory requirements, the errors would be harmless:  it is not reasonably probable Father would have obtained a more favorable result if the errors had not occurred.  (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *Guardianship of Christian G., supra,* 195 Cal.App.4th at pp. 607–608 ["even

a lack of literal compliance with a mandatory duty may be harmless error, so long as the record affirmatively reflects that the protections intended to be afforded to private parties through the exercise of that duty has been otherwise provided"].)

The purpose of engaging the CFT in the QI assessment and case plan is to ensure that input is solicited from the child, the family, and any persons important to the child or the family regarding the child's placement and case plan—such as the child's CASA, social worker, caregivers, and mental health professionals. (See § 16501, subd. (a)(4), (5).) Here, CFT meetings and other communications with CFT members occurred regularly, and the positions of T.G., Father, Mother, T.G.'s CASA, and the social worker regarding the Greenacre STRTP were known. The Department conferred with caregivers and mental health professionals from St. Vincent's in July 2022, shortly before the QI assessment in early August. Father had no history of bringing anyone to CFT meetings, and he does not claim anyone else would have attended a CFT meeting on the Greenacre placement or that any specific input was lost by not convening one. Father thus fails to show that the QI assessor, the Department, or the court lacked any information that would have been shared at a CFT meeting convened for the purpose of evaluating the Greenacre STRTP and case plan. Nor does Father show that anything would have occurred at a CFT meeting that would have made any difference to the outcome given the overwhelming evidence supporting the STRTP.[8] Thus, any errors are harmless.

---

[8]     Father argues that we should apply the standard of "harmless beyond a reasonable doubt," but he does not establish that he was deprived of due process or any other federal constitutional right.

### 5. Father's Substantial Evidence Argument

Father contends that without the CFT meeting, and without the report and QI assessment containing the input of the CFT, there is no substantial evidence to support the conclusion that the STRTP is consistent with T.G.'s short- and long-term mental and behavioral health goals and permanent plan. He adds that, while the QI assessment stated that T.G. was not ready to transition to a family-based setting, it did not address whether T.G.'s needs could be met in a family-based setting with intensive services, whether the STRTP was consistent with his best interests under rule 5.618, or whether it was the most effective and appropriate care setting for the child in the least restrictive environment.

We disagree. As described *ante*, the QI assessment and the Department's STRTP report covered all the necessary issues at length and included the views of CFT members. Just as the evidence on the issues makes any error in failing to convene a CFT harmless, it constitutes substantial evidence supporting the court's findings. Our task is not to reweigh the evidence, but to decide whether there was substantial evidence from which a trier of fact could reasonably reach the conclusions of the juvenile court. There was.[9]

### III. DISPOSITION

The orders are affirmed.

---

[9] On May 18, 2023, Father filed a request that we take judicial notice of certain published documents including DSS All-County letters and other material Father contends are germane to the STRTP. We grant the request.

_____

Chou, J.

We concur:

_____

Simons, Acting P.J.

_____

Burns, J.

*In re T.G.* / A166192, A166524